Good morning, and may I reserve two minutes for rebuttal? You can reserve whatever you want. Just watch the clock, yeah. Thank you. You don't have to ask permission. Nobody has to ask permission. Go ahead. Good morning, ladies and gentlemen, and also counsel for the United States. Mr. Afriyie is here requesting the Court to reverse the Board of Immigration Appeals finding from 2008. The grounds for that are, as indicated in my reply brief, fairly straightforward in that the immigration judge actually found the IJ in his oral decision found that Mr. Afriyie had been subjected to persecution, and that was based on a protected grounds including speech and religion. Furthermore, they made the legally unnecessary finding but did make the extraordinary finding that the applicant, Mr. Afriyie, would likely be persecuted for those if he did return and did commence his preaching or expressing his religious views in Ghana. There are some very specific, I think, errors that are in the Board of Immigration Appeals decision that I think do go contrary to the law. The most specific one, I think, is the requirement that Mr. Afriyie was obligated to identify that he would prove that he could not relocate to a different location in Ghana. The case law really indicates that that was no longer his burden once there had been a finding that there had been a, that he had been the victim of persecution. Consequently, that error, both at the oral decision, at the immigration decision, and which was also confirmed again at the BIA, is a clear error and demonstrates that there was a failing at that point. And very troubling also, and this is actually reflected in the case law in another. The IJ did seem to put the burden on him, at least at points. But what about the BIA? Did it put the burden on him? And I do have that. Yes, Justice. Looking on page, on page, the second paragraph on page two, it indicates that the burden was, or that the applicant could have been persecuted on account of protective gowns and that he could have, the evidence showed the applicant could avoid future persecution by relocating to another part and that under all circumstances it would be reasonable to expect the applicant to do so. And actually I'm inferring that. I don't see that the court is actually explicitly saying that. I would respectfully, I believe that the record at the oral decision actually indicates that the IJ really did place that burden on the applicant. Furthermore, and I identified this in my reply brief, the immigration judge did not raise that issue until after the evidence was closed. And there is a case on point that I believe I cite to that absent raising that issue prior to the decision, and that decision was raised by sua sponte, by the immigration judge, after the case had been completed, they actually raised that issue. It was not raised by the federal. One of the requirements in the statute with regard to relocation is that it has to be reasonable in all the circumstances for you to have done that. Yes, ma'am. So not having raised it, did you ever have an opportunity to address the reasonableness question? The reasonableness question is actually also addressed in my brief where we talk about the regulations that talk about the analysis the immigration court must do in order to make that requirement apply. And that analysis was not gone through. I do identify those regulations in my reply brief, and very clearly immigration judge did not review those very specific analyses that are required. There was also a specific case with a refugee in, I believe it was in the Balkans, either Serbia or Croatia, that was not, under all reasonable circumstances, it would not have been reasonable for them to relocate. And I think that would be the analysis that would need to be gone through. That was clearly not done by the immigration judge, and it was not really gone through in terms of Back up a minute. You haven't been arguing about the able or unwilling issue. But the BIA also found that the government was not unable or unwilling to protect him. And it would be helpful in that regard for me to have the sequence down, because the briefs and the various opinions seem to say different things about what was reported to the police when. My understanding is that he did report to the police the time that he himself was assaulted and ended up in the hospital. I agree with that, and actually open, because I expect that there would be a question in that regard. On page three of my, excuse me, sorry. Page going, page two going into three of my brief, I do identify with sites to the, pardon me. I'm sorry. And I apologize for misciting to my brief. It would have been on page six, seven, eight, into page nine, where I do itemize in the different paragraphs. The April 2002 incident when they were attacked by the people at the villages and Minister Freeh was hospitalized. It goes on, and I do cite to the appellate record at 205, excuse me, 249, that he did report the incident to the central police station in Kumasi, which is a larger city in northern Ghana, north central Ghana. And the record does not show that the police took any action against the perpetrator. So that very first incident, Mr. Freeh does report that. There was then the more serious sorts of incidents occurred when Mr. Frenpong was stabbed to death. That, the record indicates that was not reported to the press, but it was reported to local police. And I cite this on page eight and to the appellate record, page 213, line 1725. The police did not solve the murder. Instead, the police said they had no evidence. There were no efforts to investigate the murder. That was followed by another of Mr. Freeh's friends that were attacked. And then going into page nine, it describes Mr. Freeh's understanding of police involvement related to these matters. And he really does indicate and gives a snapshot of the effectiveness of law enforcement for this sort of incident in Ghana in that location. And I think that should be given or put in context to the finding by the immigration judge that Mr. Freeh was very credible. He makes a very clear and concise statement that Mr. Freeh was extremely credible, that he was someone that should be relied upon. And I do cite this in my reply brief. There is a Third Circuit case that is actually, and I brought a copy, but it's an extremely thorough, very lengthy, detailed analysis of another applicant for asylum from Ghana. It's the Fiyadjo case, Third Circuit case 411 F3rd 135. And at the end of my reply brief, I talk about that. But in this case, the Third Circuit actually found that there was strong evidence that, in fact, the police in Ghana have a problem with enforcing certain sorts of things, that the police do not enforce and acquiesce to acts of torture and persecution. And that's very clearly and very, what's the best phrase, in a very detailed and careful analysis, the Third Circuit goes through that and describes that. Now, this was not, this was related to a cult that exists in Ghana. It does not relate to religious preaching and persecution. We can read the case. Okay, thank you, Your Honor. I apologize. You're going to run out of time. So do you want to say something? Yes, yes, I appreciate the assistance. Thank you, Your Honor. Sure. May it please the Court, Jonathan Robbins here on behalf of the respondent, Eric Holder. Good morning, Your Honors. This case essentially boils down to two main issues. There's the issue of relocation and then there's the issue of whether the government of Ghana would be unable or unwilling to Take the second one first. Okay.  Well, the petitioner only testified as to one time when he contacted the police regarding the assault that you referred to, and you were right that it seems to be not entirely consistent throughout the case.   But what he testified to is that he only reported one incident and that he didn't report these other incidents. And the one incident that he didn't report. I thought he was testifying that the others were reported. He may not have reported them, but they were reported. Well, he was speculating as to what was happening to other people, but he didn't file reports for assaults that had happened to other people. Nor would he. I'm sorry, what? Nor would he have. Right, nor would he. What difference does that make? The question still is whether, given the whole pattern, if they were reported and the attacks on his group continued, whether he reported it or someone else reported it is immaterial in terms of evidence as to whether the government was able to protect them. Well, it's important to realize that we don't hold the police in other countries to perfect standards. Just because they're not able to solve a particular crime or to be able to completely get the resolution that you want doesn't mean that they're unable or unwilling to control it. The question is whether he was in danger because the government was unable to protect him. That's not a moral judgment. It's simply that they weren't able to protect him. Well, when you look to each case, you have to look as to why they weren't able to protect him. Now, he testified regarding the incident where he reported to police. He said that he wasn't able to provide the police with any reliable information. He wasn't able to identify anybody. I mean, the police, he did indicate that he did believe that the police were investigating, but just because the police can't solve a particular case doesn't mean that they're unable to protect him. But it leaves him in danger because they aren't able to protect him. So he remains in danger from people who are persecuting him for religious reasons who the government isn't able to protect. Isn't that literally so? Well, he's speculating that he would still be in danger. Again, the police aren't. He's not speculating because he was in danger. In fact, his house was burned down. Well, he's speculating, again, with regard to that particular aspect of potential persecution, he couldn't even establish himself that that was persecution on account of a religious ground. How could he if somebody's burning his house down? They're not standing there, but he had a pretty good guess. Again, there is a certain burden that an alien has to meet when he's showing these types of persecution, and, yes, sometimes it can be difficult to show that persecution is on account of a particular thing, but that doesn't mean he's not. The testimonian said he was a member of a group of five people who were proselytizing, and three of them were killed. Again, he's speculating as to the other instances of persecution that didn't occur to him. He was not able to testify or to present evidence either in news reports or press reports or certificates or anything along the lines of actual evidence other than his own testimony speculating as to persecution with regard to those other people. With regard to him, which the one report that he did report to the police, he testified that he didn't know how the police would be able to have solved that particular issue. Did he testify that he asked for police protection after one of his colleagues was killed? No, he testified that he filed a police report after the assault. And didn't he testify that he asked for police protection? Well, he filed a report with the police. And he asked for them affirmatively to protect him in the future. I don't recall, actually, whether he did that or not. But in his testimony, he did file a report, and he did indicate that he believed that the police were following through with that report. And certainly that's what the board found, and they didn't dispute that now. Let's talk about relocation. The IJ did seem to put the burden on him and yet found him credible, and it's clearly past persecution. So why should we read the BIA as having the BIA isn't a fact finder, so they took the record as developed. What do we do with that? Well, first of all, I think it's a little bit confusing because of the terminology past persecution. In the asylum analysis, you've got the three steps. You've got to establish past persecution. We're familiar with that, but go ahead. Okay. Well, what the immigration judge said when he said that he had suffered past persecution, what he was saying is that the incidents that he had suffered rose to the level of persecution. Oh, of course. All right. I mean, we see a lot of cases, counsel, and believe me, in this circuit, we know past persecution. The events of a credible witness testified to would fit within the heartland of what we have found to be past persecution. Let's not get hung up on that. Right. Answer my question. But the immigration judge also specifically found that the government wouldn't be unable or unwilling to help him, which means that even though he may – Mr. Robinson. Yes. Didn't the immigration judge make those findings in this context? DHS supplied the background information. Yes. And it was on the – and then, which, you know, one can draw the inference from the background information that this person could easily relocate to another part of Ghana. Yes. And I think the IJ made that comment in the context of then the petitioner offered no evidence to rebut that general background information. Wasn't that the context in which he made that remark? That was, in fact, the context. Yes. Again, first of all, with respect to the shifting burden, I mean, DHS provided all that information. You are correct. And I know the petitioner has argued that he didn't have an opportunity to rebut, but the immigration judge did specifically ask the petitioner during proceedings, can you safely relocate to Ghana, as well as multiple other questions that went to the issue of relocation, including the percentages. Again, we're talking about a Christian claiming persecution in a country for Muslims where there's 69 percent Christian versus only 16 percent Muslim, where the operational guidance notes, where the reports describe the tensions between the two. And the record shows that most of the Muslims are located in the northern part of the country. Correct. And additionally, those reports describe the religious tensions between Christians and Muslims as amicable and excellent. Those reports also indicate that the government is willing and able to control. Again, that's evidence that even though we don't hold police to a perfect standard, the reports do indicate that the government does, you know, protect the religious freedoms of people. So with respect to the government being unable or willing to control, when you have that kind of strong evidence to rebut the petitioner's claim of the problems that he's facing with the police, the standard of review is does the record compel reversal of the government being unable or unwilling to control. I have a comment which is linked to a particular problem. Overall, the transcript in this case is impossible to use. And I'm going to give you an example now because I'm about to read something, but it just seems outrageous for this to be the product that we're supposed to be working with in terms of figuring out what he said. And I don't know whether anything has been done about this, but it's replete with typos, it's replete with mistaken words, and it's replete with indiscernibles in key places. Is there anything that's being done to prevent this from happening? Well, I mean, these transcripts I know are made from tapes. That's true, but for example, I was just about to read you on the issue of whether he asked for police protection, to go back to that. But this is one of about 50 or 75 examples in this transcript. What did you do to get police protection, if anything? We actually went to the police to seek their help. When we told them that we were preaching, we needed to have them. But they only have one gun among the police. They're not going to bring that gun to your preaching. And they are trying to put out, and this is the sentence, they are trying to put out the huge amount that they are going to send for me indiscernible. So I don't know what he said at the end there, and neither do you. But he did say that specifically that they asked the police to help them and that the police couldn't because they only had one gun. Why isn't that a demonstration that they weren't able to protect them? Not that they weren't willing, but they weren't able. Again, this is evidence that is contradictory to the reports that indicate that the government is. But for sure, our case law says when you have actual credible evidence of something that happened, the fact that the reports say that in general it doesn't happen is not proof that it didn't happen. And in fact, he was found credible overall. He was found credible, that's true. But just because the police force, again, we don't hold police forces in other countries to perfect standards. And the reports do indicate that sometimes religious tensions between groups can flare up, but that ultimately they're quickly resolved. Now, I don't know the specific, again, with this transcript problem, but if you're going to claim that the record should be remanded based on something that's indiscernible, you have to say what it was that was said that was indiscernible. The immigration judge in this case recapped the entire testimony in his decision. Judge's opinion was also fairly incomprehensible for the same reason. It was also full of indiscernibles and typos and non-words and so on. They haven't disputed any of the findings of fact by the immigration judge with, I see I'm going over my time here, I'm just mad. You can finish. They haven't argued that any of the findings of fact by the immigration judge were incorrect. I mean, they see the word indiscernible in the transcript and are jumping over that. I wasn't relying on that. It just triggered in my mind a problem I had with the whole case. What was in the sentence that I read you seemed to be sufficient to demonstrate that it specifically asked for police protection and didn't get it. What else could they demonstrate with respect to unable and unwilling? Well, again, I'm over my time. Again, we have different conflicting evidence. We have his testimony as to the police in this case. We also have reports that specifically say. To repeat, the I.J. said he believed him. He was a credible person. He did, yes. So he believed what he said. I think we're at an impasse. Thank you very much for your time. Thank you. And I saw the clock. I'm not sure if it started up again. You have time. You have a minute. In the interim, I did go through and review the I.J.'s decision. On page 16 of the decision, appellate record 164, first full paragraph, and this is why I'm taking that he placed the burden to show relocation on the respondent, Mr. Afri. The respondent has not established by competent and credible objective evidence that he could not relocate indiscernible to Ghana, a county or, excuse me, a country where 70% of the population is Christian and so on. And I read that as that Mr. Afri was obligated. It is ambiguous, which is an inherent problem with that decision. And I think that's. Well, do we review that? Or, I mean, did the BIA agree with that? Don't we review the BIA decision in this case? Yes, Your Honor. Yes, Justice. What did the BIA say about that? The BIA. It didn't adopt that, did it? It did not adopt that. And I think the case law in terms of the scope of review and the cases that talk about if there is a adopting of part of the record from the BIA decision or from the IJ decision, or if the IJ decision is necessary to understand the BIA decision, then the court would review that. And I think the record from the BIA is ambiguous. This seems to indicate that it really they're placing the burden at the lower level on Mr. Afri. And, again, I don't believe I saw this, and I did review the record, that this was raised prior to closing of the evidence, that this was a decision that was raised by the court, not by the government or by Mr. Afri. And I recognize counsel raised it that it may have been brought up. I didn't see that. So if I missed it, I apologize, but I did not see that. Okay. Thank you, Your Honor. Okay. Thank you. Thank you. Okay. Counsel, thank you for the arguments. The case is submitted.
judges: Tashima, Fisher, Berzon